No. 21-2438

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

BENJAMIN ZIRPOLI, on behalf of himself and all others similarly situated,

*Plaintiff-Appellee*,

v.

MIDLAND FUNDING LLC,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

The Honorable Jennifer Wilson

Case No. 1:19-cv-01428

**BRIEF OF APPELLEE**

Karla Gilbride
Matthew C. Clifford
(Bar admission pending)
Public Justice, P.C.
1620 L Street NW, Suite 630
Washington, D.C. 20036
(202) 797-8600

Kevin Abramowicz
Kevin Tucker
East End Trial Group LLC
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
(412) 223-5740

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................v

ABBREVIATIONS USED IN THIS BRIEF ..................................... xiii

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION .......................................................2

STATEMENT OF THE ISSUES PRESENTED .....................................3

STATEMENT OF RELATED CASES....................................................4

STATEMENT OF THE CASE ...............................................................5

I.     Statutory Background ................................................................5

II.    Counter-Statement of Facts........................................................6

III.   Counter-Statement of Procedural History..................................8

SUMMARY OF ARGUMENT ............................................................11

STANDARD OF REVIEW ..................................................................13

ARGUMENT........................................................................................14

I.     Zirpoli Challenged the Existence of An Agreement to Arbitrate Between Himself and Midland, and the District Court Correctly Held No Such Agreement Was Formed. ......................................14

       A.     Zirpoli Did Not Form an Agreement to Arbitrate with Midland in 2015, When He Formed an Agreement to Arbitrate with OneMain. ..................................................15

       B.     Zirpoli Did Not Form an Agreement to Arbitrate with Midland in 2016 or Anytime Thereafter...........................17

C.      The Severability Doctrine Is Not Implicated Here Because
        Plaintiff Did Not Challenge the Validity or Existence of Any
        Container Contract. ............................................................20

II.    Alternatively, the FAA Does Not Permit Midland to Petition a Court
       to Compel Arbitration Under OneMain's Arbitration Agreement
       with Zirpoli Because Midland Is Not a "Party" to That Agreement.............23

       A.      The FAA Limits the Right to Petition a Court to Compel
               Arbitration to a "Party" to the Arbitration Agreement. ......................24

               1.      "Party" Under § 4 Means a Contractual Party to the
                       Arbitration Agreement. ...........................................25

               2.      Supreme Court Precedent Forecloses Reading "Party"
                       as Referring to a Litigant and Strongly Supports That It
                       Means a Contractual Party. ......................................30

               3.      The Distinction Federal Courts Have Long Drawn
                       Between the Judicial Power Exercised Under §§ 3 and
                       4 Also Supports Reading "Party" as a Party to the
                       Arbitration Agreement. ...........................................33

       B.      Midland Is Not a "Party" to the Zirpoli-OneMain Arbitration
               Agreement as That Term Was Understood in 1925. ..........................36

       C.      Whether Midland Is a "Party" Within the Meaning of § 4
               Goes to the District Court's Jurisdiction to Hear Midland's
               Motion to Compel and This Court's Jurisdiction to Hear Its
               Interlocutory Appeal. .......................................................36

               1.      The District Court Lacked Jurisdiction over Midland's
                       Motion to Compel Arbitration.................................37

               2.      This Court's Jurisdiction Is Limited to Correcting the
                       District Court's Error in Treating Midland's Motion as
                       a § 4 Petition and Assuming Jurisdiction over It. ....................38

III.   The Presence of a Delegation Clause in Zirpoli's Arbitration
       Agreement with OneMain Did Not Affect the District Court's
       Jurisdiction Over the Contract Formation Issues Involving Midland...........40

IV.    OneMain's Purported Assignment to Midland Was Illegal and Void
       Under Pennsylvania Law. .............................................................43

       A.    OneMain Could Not Sell Its Contract with Zirpoli to Midland
             Because Midland Is Not Licensed Under the CDCA.........................43

       B.    Midland's Possession of Other Licenses Is Irrelevant to
             Whether OneMain Could Sell the Account to Midland. ...................44

       C.    OneMain's Attempted Sale to Midland Is Void Ab Initio
             Under Pennsylvania Law. ...............................................46

CONCLUSION ..............................................................................50

COMBINED CERTIFICATIONS ........................................................52

# Table of Authorities

**Page(s)**

## Cases

*Abdul-Akbar v. McKelvie*,
 239 F.3d 307 (3d Cir. 2001) ............................................................. 18

*ADT, L.L.C. v. Richmond*,
 No. 21-10023, 2021 WL 5228520 (5th Cir. Nov. 10, 2021) ...................... 26, 32

*Air Wis. Airlines Corp. v. Hoeper*,
 571 U.S. 237 (2014) ........................................................................ 25

*Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*,
 588 A.2d 491 (Pa. 1991) ....................................................... 46, 47, 48

*Am. Safety Equip. Corp. v. J. P. Maguire & Co.*,
 391 F.2d 821 (2d Cir. 1968) .............................................................. 19

*Arthur Andersen LLP v. Carlisle*,
 556 U.S. 624 (2009) ...................................................... 26, 28, 29, 32

*Bey v. Crown Asset Mgmt., LLC*,
 No. 2:20-CV-00715-CCW, 2021 WL 4078657 (W.D. Pa. Sept. 8,
 2021) ......................................................................................... 23

*Borough of Pottstown v. Pa. Mun. Ret. Bd.*,
 712 A.2d 741 (Pa. 1998) .................................................................. 44

*Buckeye Check Cashing, Inc. v. Cardegna*,
 546 U.S. 440 (2006) .................................................................. *passim*

*Carpenter v. United States*,
 138 S. Ct. 2206 (2018) ..................................................................... 25

*CD&L Realty LLC v. Owens Illinois, Inc.*,
 535 F. App'x 201 (3d Cir. 2013) ......................................................... 22

*Dandar v. Commonwealth*,
 No. 1:02-CV-00222-BR-SPB, 2017 WL 919374 (W.D. Pa. Mar. 8,
 2017) ......................................................................................... 38

*Dippel v. Brunozzi*,
  74 A.2d 112 (Pa. 1950) ...............................................................46, 47

*Doctor's Assocs., Inc. v. Distajo*,
  66 F.3d 438 (2d Cir. 1995) ...............................................................32

*Facebook, Inc. v. Duguid*,
  141 S. Ct. 1163 (2021) ...................................................................27

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ...............................................................37

*FDA Packaging Inc. v. Advance Pers. Staffing Inc.*,
  73 Pa. D. & C. 4th 420 (C.P. Berks 2005) .......................................49

*Feingold v. State Farm Mut. Auto. Ins. Co.*,
  No. 11-CV-6309, 2012 WL 1106653 (E.D. Pa. Apr. 3, 2012) ........47

*First Home Sav. Bank, FSB v. Nernberg*,
  648 A.2d 9 (Pa. Super. Ct. 1994) .....................................................14

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ........................................................................42

*Flatow v. Islamic Republic of Iran*,
  305 F.3d 1249 (D.C. Cir. 2002) ........................................... 3, 13, 39

*Flintkote Co. v. Aviva PLC*,
  769 F.3d 215 (3d Cir. 2014) .............................................................14

*Gen. Refractories Co. v. First State Ins. Co.*,
  No. 04-CV-3509, 2012 WL 568936 (E.D. Pa. Feb. 22, 2012) ........49

*Goldman v. Citigroup Glob. Mkts. Inc.*,
  834 F.3d 242 (3d Cir. 2016) .............................................................31

*Gordon v. Kohl's Dep't Stores, Inc.*,
  172 F. Supp. 3d 840 (E.D. Pa. 2016) ...............................................47

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010) ........................................................................41

vi

*Griswold v. Coventry First LLC*,
762 F.3d 264 (3d Cir. 2014) ............................................................. 13

*Harper v. Amazon.com Servs., Inc.*,
12 F.4th 287 (3d Cir. 2021) .............................................................. 13

*Hermès of Paris, Inc. v. Swain*,
867 F.3d 321 (2d Cir. 2017) .............................................................. 32

*Hodge v. Bluebeard's Castle, Inc.*,
392 F. App'x 965 (3d Cir. 2010) ....................................................... 39

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
141 S. Ct. 2172 (2021) ...................................................................... 27

*Jackson v. Champion*,
166 F.3d 1221 (10th Cir. 1998) ........................................................ 39

*Johnson v. United States*,
559 U.S. 133 (2010) .......................................................................... 25

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009) ............................................................. 17

*Koch v. Compucredit Corp.*,
543 F.3d 460 (8th Cir. 2008) ............................................... 11, 18, 19

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013) .......................................................... 42

*Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.*,
126 F.2d 978 (2d Cir. 1942) ....................................................... 33, 34

*Martinez v. Evans*,
585 F. App'x 389 (9th Cir. 2014) ..................................................... 39

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
247 F.3d 44 (3d Cir. 2001) ............................................................... 18

*Mellish v. CACH, LLC*,
No. 19-CV-1217, 2020 WL 1472405 (W.D. Pa. Mar. 26, 2020) ..................... 50

*Montgomery v. Goodwin*,
  841 F. App'x 700 (5th Cir. 2021)........................................................39

*Munroe v. Central Bucks Sch. Dist.*,
  805 F.3d 454 (3d Cir. 2015)...............................................................13

*MZM Construction Co., Inc. v. New Jersey Building Laborers
  Statewide Benefit Funds*,
  974 F.3d 386 (3d Cir. 2020)...............................................20, 21, 41

*Neff v. Portfolio Recovery Assocs., LLC*,
  No. 2:19-CV-1028-DSC, 2021 WL 4958690 (W.D. Pa. Oct. 26,
  2021) ...................................................................................................23

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019)...................................................................24, 25

*Palermo Gelato, LLC v. Pino Gelato, Inc.*,
  No. 2:12-CV-00931, 2013 WL 285547 (W.D. Pa. Jan. 24, 2013) ...................49

*Paul v. Paul*,
  109 A. 674 (Pa. 1920).........................................................................47

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967).....................................................................15, 20

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010).........................................................................40, 41

*SBRMCOA, LLC v. Bayside Resort, Inc.*,
  707 F.3d 267 (3d Cir. 2013).................................................................22

*Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*,
  293 U.S. 449 (1935).............................................................................33

*Shular v. United States*,
  140 S. Ct. 779 (2020).........................................................................27

*Singh v. Uber Techs. Inc.*,
  939 F.3d 210 (3d Cir. 2019).................................................................13

*Snyder v. Ngo*,
    No. 1389 EDA 2012, 2013 Pa. Super. Unpub. LEXIS 1183 (Pa.
    Super. Ct. Mar. 20, 2013)...................................................................48

*Sullivan v. Stroop*,
    496 U.S. 478 (1990).......................................................................29

*United States v. Ubani*,
    582 F. App'x 333 (5th Cir. 2014).............................................37, 39

*Vaden v. Discover Bank*,
    556 U.S. 49 (2009)....................................................................31, 32

*Vineland Chem. Co. v. U.S. E.P.A.*,
    810 F.2d 402 (3d Cir. 1987)...........................................................39

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989).........................................................................5

*Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*,
    No. 16-CV-4850, 2021 WL 256071 (E.D. Pa. Jan. 26, 2021)...........47

*Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.*,
    No. 13-CV-499-RGA, 2014 WL 1389974 (D. Del. Apr. 9, 2014)...................50

*Yellen v. Confederated Tribes of Chehalis Reservation*,
    141 S. Ct. 2434 (2021)...................................................................25

*Yeomans v. World Fin. Grp. Ins. Agency, LLC*,
    No. 20-16937, 2021 WL 5356537 (9th Cir. Nov. 17, 2021)............24

*Zimmer v. CooperNeff Advisors, Inc.*,
    523 F.3d 224 (3d Cir. 2008)...........................................................13

**Statutes**

7 P.S. § 6202........................................................................44, 45

7 P.S. § 6203.A.......................................................................6, 45

7 P.S. § 6203.B...........................................................................45

7 P.S. § 6203.C...........................................................................45

7 P.S. § 6205 ................................................................................ 45

7 P.S. § 6206 ................................................................................ 45

7 P.S. § 6207 ................................................................................ 45

7 P.S. § 6209 ................................................................................ 45

7 P.S. § 6210 ................................................................................ 45

7 P.S. § 6211 ................................................................................ 45

7 P.S. § 6212 ................................................................................ 45

7 P.S. § 6213 ................................................................................ 45

7 P.S. § 6213.E ............................................................................... 6

7 P.S. § 6214.I ........................................................................ *passim*

7 P.S. § 6216.1 .............................................................................. 45

7 P.S. § 6217 .................................................................... 9, 45, 46

7 P.S. § 6217.1.A ............................................................................ 6

7 P.S. § 6218 ................................................................................ 45

41 P.S. § 201 .................................................................................. 5

1 Pa.C.S. § 1933 ............................................................................ 46

9 U.S.C. § 2 ...................................................................... 5, 20, 30

9 U.S.C. § 3 ............................................................................ *passim*

9 U.S.C. § 4 ............................................................................ *passim*

9 U.S.C. § 5 .................................................................................. 30

9 U.S.C. § 6 .................................................................................. 40

9 U.S.C. § 9 .......................................................................... 28, 30

9 U.S.C. § 10 ................................................................................ 30

9 U.S.C. § 11 ...............................................................................................30

9 U.S.C. § 16 ............................................................................................3, 39

28 U.S.C. § 1331............................................................................................2

28 U.S.C. § 1332(d) .......................................................................................2

Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*)................................2

Fair Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*)..................2

**Other Authorities**

10 Pa. Code § 41.1 ......................................................................................48

10 Pa. Code § 41.6(a)...............................................................................6, 44

3 Samuel Williston, The Law of Contracts § 1453 (1st ed. 1920) .........35

Arbitration Law, ch. 275, § 2, 1920 N.Y. Laws 804 ..............................31

Arbitration Law, ch. 275, § 3, 1920 N.Y. Laws 804 ..............................32

A Concise Law Dictionary for Students and Practitioners (Percy
    George Osborn ed., 1927) ......................................................................26

Ballentine's Law Dictionary (1st ed. 1916)......................................26, 36

Black's Law Dictionary (2d ed. 1910) ...........................................25, 26

Baldwin's Century Edition of Bouvier's Law Dictionary (William
    Edward Baldwin ed., 1926)............................................................26, 36

Dictionary of Terms and Phrases Used in American or English
Jurisprudence (Benjamin Vaughan Abbott ed., 1879) ....................25, 36

Fed. R. Civ. P. 56.....................................................................................10, 13

L.A.R. 28.1 ...................................................................................................4

L.A.R. 28.2 ...................................................................................................4

Md. Code Ann., Cts. & Jud. Proc. § 3-207 .............................................31

Restatement (Second) of Contracts § 317 (1981) .................................................47

S. Rep. No. 68-536 (1924) ....................................................................................32

The Pocket Law Lexicon (Joseph E. Morris ed., 4th ed. 1905) ............................26

Webster's New International Dictionary of the English Language (W.
    T. Harris & F. Sturges Allen eds., 1923) ........................................................35

# ABBREVIATIONS USED IN THIS BRIEF

CDCA: Consumer Discount Company Act

FAA: Federal Arbitration Act

JA: Joint Appendix

LIPL: Loan Interest and Protection Law

MCM: Midland Credit Management

PSA: Purchase and Sale Agreement

**INTRODUCTION**

In 2015, Plaintiff-Appellee Benjamin Zirpoli ("Zirpoli") entered into two agreements with OneMain Financial, LLC ("OneMain"), a non-bank finance company licensed by the Pennsylvania Department of Banking under the CDCA to make high-interest loans. One agreement was to borrow $6,200.08 from OneMain and repay $11,364.35 at a 26.91% interest rate (the "Loan" or "Account"). JA315. The other was to arbitrate future disputes regarding the Loan, including threshold disputes over arbitrability, with OneMain and certain specified other parties. JA318–19. Defendant-Appellant Midland Funding LLC ("Midland") was not a party to either of these agreements when they were formed in 2015.

Midland later attempted to purchase the Loan from OneMain and initiate collection proceedings against Zirpoli, but because Midland was not licensed under the CDCA and had not obtained permission for the sale from the Pennsylvania Department of Banking, it lacked the legal right to do either of these things. In 2019, Zirpoli sued Midland under federal and Pennsylvania law on behalf of a class of people with CDCA loans against whom Midland had attempted similar unauthorized collection activities. After Zirpoli filed suit, Midland doubled down on its parasitic tactics. It attempted to use Zirpoli's arbitration agreement with OneMain, and § 4 of the FAA, to compel Zirpoli's dispute with Midland into individual arbitration.

Midland cannot compel arbitration here for at least three reasons. First, Midland never formed an agreement to arbitrate disputes with Zirpoli, including threshold disputes over arbitrability, through the typical method of offer and acceptance. Second, Midland never formed an agreement to arbitrate with Zirpoli by stepping into OneMain's shoes as an assignee. Third, because Midland is not a "party" to any agreement with Zirpoli, it was not authorized to file a petition to compel arbitration under § 4 of the FAA, and the district court lacked jurisdiction over Midland's unauthorized motion to compel.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over Plaintiff's federal claims under the Fair Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*) and the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq*.) pursuant to 28 U.S.C. § 1331. It had subject matter jurisdiction over his state-law claims under 28 U.S.C. § 1332(d) because there are more than 100 members of the proposed class, at least one class member is a citizen of a different state than Defendants, and the amount in controversy exceeds $5 million.

However, as discussed below in part II, the district court lacked subject matter jurisdiction over Midland's motion to compel arbitration because Midland is not a "party" within the meaning of 9 U.S.C. § 4. Specifically, Midland is not a party to a "written agreement for arbitration" with Zirpoli and, thus, cannot avail itself of the

2

procedures outlined in § 4 of the FAA.[1] Because Midland was not authorized to petition for arbitration under § 4[2] and the district court lacked statutory jurisdiction over Midland's motion to compel, this Court's appellate jurisdiction is limited to correcting the jurisdictional error below. *See Flatow v. Islamic Republic of Iran*, 305 F.3d 1249, 1253 (D.C. Cir. 2002) (vacating order where district court lacked jurisdiction to rule on the motion at issue).

Plaintiff agrees with Defendant that this appeal is timely. Appellant Br. 1.

## STATEMENT OF THE ISSUES PRESENTED

1.    Did an agreement to arbitrate ever come into existence between Zirpoli and Midland, either through assignment of OneMain's rights to Midland or through any other means?

2.    Given that Midland is not a "party" to a written arbitration agreement with Zirpoli, was it proper for Midland to move to compel arbitration under 9 U.S.C. § 4 and proper for the district court to rule on that motion?

---

[1] Midland suggests it also sought relief under 9 U.S.C. § 3 by seeking a stay of the federal-court proceedings pending arbitration, Appellant Br. 4, and correspondingly invokes this Court's jurisdiction under 9 U.S.C. § 16(a)(1)(A). However, Midland never specifically invoked 9 U.S.C. § 3 below in moving to stay, *see* JA73, 305, and treated its motion to stay as derivative of its motion to compel. Nor did the district court invoke § 3 in denying Midland's motion to stay. It denied the motion as moot after ruling on Midland's motion to compel. JA27–28.

[2] Unless otherwise noted, statutory section references correspond to the FAA.

3.     Is the question of whether an arbitration agreement ever came into existence between Zirpoli and Midland the sort of question that can be delegated to an arbitrator, and if so, does the delegation clause in the arbitration agreement between Zirpoli and OneMain provide clear and unmistakable evidence of an intent to delegate that contract formation question regarding non-parties?

4.     Does Midland's possession of non-CDCA licenses affect the analysis of whether it was illegal for OneMain to sell CDCA loans to Midland when Midland did not have a CDCA license and did not seek advance permission for the transfer from the Pennsylvania Department of Banking?

## STATEMENT OF RELATED CASES

Pursuant to L.A.R. 28.1(a)(2) and L.A.R. 28.2, Plaintiff is not aware of any related case that has been completed, is pending or is about to be presented before this Court or any other state or federal court or agency, other than *Lutz v. Portfolio Recovery Associates, LLC*, No. 21-1656, also mentioned by Midland, which relates to the Pennsylvania state law issue described in part IV-B below.

# STATEMENT OF THE CASE[3]

## I.    Statutory Background

The FAA was enacted in 1925 "'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and place such agreements 'upon the same footing as other contracts.'" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (citations omitted). This same-footing principle is codified in § 2, which states that written agreements to arbitrate future disputes are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition a federal district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. A district court faced with such a petition may compel arbitration only after it is "satisfied that the making of the agreement for arbitration" is not "in issue." *Id.*

Pennsylvania's usury statute, the LIPL, caps interest charged on loans of $50,000 or less at 6%. 41 P.S. § 201. The CDCA, first enacted in 1937, creates an

---

[3] Plaintiff-Appellee will not provide a full recitation of the facts and procedural history where that would be duplicative of the facts presented by Midland, but will correct the factual presentation in areas where Midland's statement was incomplete or inaccurate.

exception for non-bank finance companies with CDCA licenses. 7 P.S. § 6203.A. These companies can charge interest exceeding the LIPL's 6% cap on consumer loans of $25,000 or less. 7 P.S. §§ 6213.E, 6217.1.A.

The CDCA prohibits CDCA-licensees from selling loan contracts authorized by the CDCA to a company that does not hold a CDCA license without prior written approval from the Department of Banking. 7 P.S. § 6214.I ("A licensee may not sell contracts to a person or corporation not holding a license under this act without the prior written approval of the Secretary of Banking."); 10 Pa. Code § 41.6(a) (implementing regulation).

## II.   Counter-Statement of Facts

In 2015 OneMain issued the Loan to Zirpoli in the amount of $11,364.35, which consisted of $6,200.08 in principal, $4,989.32 in precomputed interest, a $150.00 service charge, and a $24.95 extension charge. JA85, 315. The terms of the loan contract were set out in a Disclosure Statement, Note and Security Agreement ("Note."). JA85–87, 315–17. Zirpoli and OneMain also entered into a separate Arbitration Agreement, which was executed on "the date of the Note," June 1, 2015. JA82–83, 318–19. [4]

---

[4] The Note stated that it incorporated the Arbitration Agreement "between Borrower . . . and Lender" by reference. JA317.

The Note listed the Annual Percentage Rate on the Loan as 26.91%, which exceeds the 6% interest rate that can be charged by a non-bank finance company in Pennsylvania without a CDCA license. JA85, 315. OneMain held a CDCA license in 2015, when it issued the Account. JA514–17.

Midland attempted to buy the Loan from OneMain through a Bill of Sale and Assignment dated November 23, 2016. JA89–91, 352–54. This attempted purchase was governed by a Purchase and Sale Agreement ("PSA") under which Midland claimed it "obtained all consents, approvals, authorizations or orders of any court or governmental agency" necessary for the "performance . . . of this Agreement." JA103, 328 (4.1). Yet Midland never possessed a CDCA license. JA504, Request for Admission 4. Nor did Midland seek approval from the Department of Banking to purchase the Account. JA505, Request for Admission 7.[5] Further, the PSA provided that account documents related to the accounts being transferred remained the sole property of OneMain. These documents could be used by Midland for only two reasons: 1) to lawfully recover on an account; and 2) "for the purpose of *defending* any claim, suit, action or other third party proceeding instituted against" Midland. JA105, 330 (6.2(b) (emphasis added)).

---

[5] OneMain also did not seek written approval from the Department of Banking before making the attempted sale to Midland. JA532–33.

In March 2018, Midland, along with its affiliated servicing company MCM, sued Zirpoli in a Franklin County magisterial court to collect on the Loan. JA37 ¶¶13–14. Zirpoli hired an attorney, and Midland and MCM dismissed the collection action. JA37 ¶¶15–16.

## III.    Counter-Statement of Procedural History

Midland's account of the district court proceedings omits the fact that it filed two motions to compel arbitration in this case, Dkt. 18, Dkt. 37, and that the district court issued two intervening orders before the one now on appeal.

After Midland's first motion to compel was fully briefed, the district court ordered supplemental briefs on the delegation clause. The court asked whether, "[d]espite the purported delegation clause," it must "decide whether an arbitration agreement exists (i.e., whether Midland is a party to the arbitration agreement) before ordering any arbitration." JA274. Midland answered in the negative, describing the question as going to the Arbitration Agreement's "enforceability," thus making it subject to the delegation clause. JA279. Zirpoli answered in the affirmative, explaining that "Midland cannot enforce the Agreement's arbitration or delegation clauses" without first proving the validity of the assignment, because if Midland was never assigned OneMain's rights to the Loan, then Midland is not a party to the Arbitration Agreement. JA282, 286.

On July 15, 2020, the district court denied Midland's first motion to compel without prejudice. The court ordered further discovery, including into whether the Department of Banking approved the transfer of the Loan. JA298. The court also resolved the delegation clause issue, construing Zirpoli as arguing that no "agreement to arbitrate <u>exists</u> between him and Midland" (because of the invalid assignment) and concluding that the court may resolve this "existence issue" despite the presence of a delegation clause. JA300–01.

On October 30, 2020, Midland renewed its motion to compel. JA305. Midland argued that the assignment was valid because Midland held non-CDCA licenses that exempt it from the CDCA under 7 P.S. § 6217, JA398–99,[6] and that even if the assignment were invalid, the Arbitration Agreement was severable, and was separately assigned, JA392–93, 565. Zirpoli again argued that because the purported OneMain-Midland assignment was made without the required approval, in violation of the CDCA, "Midland fails to prove any agreement exists between Midland and Zirpoli." JA419. Zirpoli further argued that Midland's possession of non-CDCA licenses did not change the fact that Midland lacked a CDCA license and that the

---

[6] Midland Funding and its affiliated servicer, MCM, both possess sales finance licenses with the Department of Banking, and MCM also has a collector-repossessor license. JA356.

attempted sale of the Account was therefore illegal under Pennsylvania law. JA428–30.

The district court denied Midland's renewed motion to compel arbitration on July 7, 2021, this time applying a Federal Rule of Civil Procedure 56 standard because the parties had completed arbitration-related discovery. JA10. The court reiterated that Zirpoli "contested the existence of a valid agreement to arbitrate between himself and Midland" and that the court could address this "existence issue" despite the presence of a delegation clause that was not specifically challenged. JA12–13. The court then reasoned that without privity of contract between Midland and OneMain through a valid assignment, Midland lacked authority to compel Zirpoli's claims into arbitration. JA14. Concluding that the sale of the Account from CDCA-licensed OneMain to CDCA-unlicensed Midland without advance Department of Banking approval had "an illegal purpose" in violation of the CDCA, the court held that the assignment was void and unenforceable. JA16–21.

Addressing Midland's argument that it is exempt from the CDCA because it possesses other licenses with the Department of Banking, the court concluded that what mattered was that the Account was governed by the CDCA. By purchasing it, Midland was required to comply with the advance-approval requirement of 7 P.S. § 6214.I, which it failed to do. JA25. Finally, the court rejected Midland's argument that the arbitration agreement was separately assignable from the right to collect the

10

Loan, holding that "the entire assignment contract between OneMain and Midland is illegal and void, including the right to compel arbitration, because the making of the assignment contract itself violated the CDCA." JA26. After denying Midland's motion to compel arbitration on these grounds, the court denied its motion to stay the proceedings "as moot." JA27.

## SUMMARY OF ARGUMENT

Zirpoli agreed to arbitrate future disputes about the Loan with OneMain and certain OneMain-related parties, but he never agreed to arbitrate such disputes with Midland. The only basis on which Midland claimed the right to compel Zirpoli to arbitrate was as an assignee of OneMain's contractual rights, and so it was proper for the district court to consider the validity of the attempted assignment of those rights in order to determine if an agreement to arbitrate between Zirpoli and Midland was ever formed. *Koch v. Compucredit Corp.*, 543 F.3d 460, 465 (8th Cir. 2008). Nor did the district court's consideration of the validity of that attempted assignment implicate the Supreme Court's "severability principle" that arbitration agreements must be challenged separately from the larger contracts containing them, because the agreement purportedly assigning OneMain's rights to Midland was not a contract containing an arbitration agreement.

Alternatively, the district court erred as a jurisdictional matter by ruling on Midland's motion to compel at all, because Midland was not a "party" to Zirpoli's

arbitration agreement with OneMain and thus was not a "party" authorized to petition a federal court under § 4. "Party" was a well-understood term of art when the FAA was passed in 1925, which meant either a "litigant" or a "party to a contract." But textual clues within the FAA, as well as relevant Supreme Court and circuit authority, establish "contractual party" as the most natural meaning of that term. And because Midland was not a "party" to OneMain's arbitration agreement with Zirpoli, as that term was understood in 1925, it was not a "party" entitled to seek specific performance of that agreement under § 4. Because the district court lacked statutory jurisdiction over Midland's motion to compel, this Court's own jurisdiction is limited to correcting the jurisdictional error below.

Finally, Midland's reference to the delegation clause in the Zirpoli-OneMain arbitration agreement, and to the other licenses Midland and its affiliates possess with the Pennsylvania Department of Banking, have no bearing on this appeal. The delegation clause is irrelevant because Zirpoli challenged the existence of an arbitration agreement between himself and Midland, a threshold dispute that cannot be delegated, and in any event, there is no "clear and unmistakable" evidence in Zirpoli's arbitration agreement with OneMain of an intent to arbitrate threshold questions of arbitrability with non-parties like Midland. And Midland's other Department of Banking licenses, and its claims to be exempt from regulation under the CDCA, are irrelevant because OneMain lacked the authority to transfer Zirpoli's

Account to Midland without approval from the Department of Banking, 7 P.S. § 6214.I, rendering that attempted assignment void under Pennsylvania law.

## STANDARD OF REVIEW

A district court's order denying a motion to compel arbitration under § 4 of the FAA is reviewed de novo. *Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287, 292 n.3 (3d Cir. 2021). This Court applies "the same standard" the district court used— the Rule 56 standard. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 217 (3d Cir. 2019). Under this standard, "[t]he party opposing arbitration is given the benefit of all reasonable doubts and inferences that may arise." *Griswold v. Coventry First LLC*, 762 F.3d 264, 270 (3d Cir. 2014). While the standard of review is de novo, factual findings made by the district court are reviewed for clear error. *Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 228 (3d Cir. 2008).

This Court may affirm the district court's order on any ground supported by the record. *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 469 (3d Cir. 2015). Alternatively, if this Court finds the district court lacked jurisdiction over Midland's motion to compel arbitration, it can vacate that order without affecting the district court's subject matter jurisdiction over Zirpoli's underlying federal and state claims. *See Flatow*, 305 F.3d at 1255 (vacating the district court's "opinion on [the] issue" raised by the party's appeal over which the district court lacked jurisdiction, but affirming other parts of the district court's order).

13

# ARGUMENT

### I.  Zirpoli Challenged the Existence of An Agreement to Arbitrate Between Himself and Midland, and the District Court Correctly Held No Such Agreement Was Formed.

Midland asserts that, because "Zirpoli admits there was a valid agreement to arbitrate between himself and OneMain," Appellant Br. 10, he did not challenge "the Arbitration Agreement" at all, Appellant Br. 13. But there is no such thing as a free-floating "arbitration agreement" that exists in perpetuity, untethered from the parties to that agreement. Rather, contracts are formed between specific parties—offerors and offerees. *See First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 14–15 (Pa. Super. Ct. 1994).[7]

Federal courts follow this party-specific approach when evaluating motions under the FAA. Indeed, the first step in "deciding whether a party may be compelled to arbitrate under the FAA" is to determine "whether there is a valid agreement to arbitrate *between the parties*." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (emphasis added). Zirpoli did not dispute he entered into an agreement to arbitrate with OneMain and the other parties listed in that agreement's definition of "We/Us." But he explicitly and repeatedly disputed he ever formed an agreement to arbitrate with Midland. JA286, 419.

---

[7] The arbitration agreement specifies that it is governed by the law of the state where the closing of the credit transaction took place, in this case Pennsylvania. JA319.

Midland suggests that Zirpoli's challenge to the existence of an arbitration agreement with Midland was an impermissible attack on a "container contract," in violation of the severability principle enunciated in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04 (1967), and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006), because this challenge implicates the validity of the OneMain-Midland assignment. This misses the mark because the Bill of Sale purportedly assigning the Account to Midland was not the container contract for any arbitration agreement. *Prima Paint* and *Buckeye*—like every container contract case Midland cites—involved arbitration agreements embedded in larger contracts between the same two parties. The only two such nested contracts between the same two parties here are the Note memorializing the Loan between Zirpoli and OneMain,and the arbitration agreement incorporated in that Note. Midland admits Zirpoli challenges neither of these contracts. Appellant Br. 11. Midland's severability cases are inapposite.

### A.    Zirpoli Did Not Form an Agreement to Arbitrate with Midland in 2015, When He Formed an Agreement to Arbitrate with OneMain.

The arbitration agreement between Zirpoli and OneMain defines "We" and "Us" to encapsulate various entities related to OneMain, including its "past, present or future" parents, subsidiaries, affiliates, assignees and successors. JA318. Midland argued before the district court that, because "We" includes OneMain's future assignees and Midland was a future assignee of OneMain, Zirpoli "preemptively

agreed" to arbitrate with Midland "long before" Midland ever purchased the Account. JA391.

Midland apparently abandoned this argument on appeal—and for good reason. While a party can preemptively agree to do many things, such as release future unknown claims or (as here) arbitrate future disputes, the contingent nature of those future events often requires that the agreement be expressed in general terms, because greater specificity is impossible. If OneMain knew who its future parents, subsidiaries, affiliates or assignees were going to be at the time it entered into the arbitration agreement with Zirpoli, it could have named them; but because it didn't know, it left those categories open-ended, so that the list of entities constituting "We" and "Us" could change over time.

But the arbitration agreement also calls for "We" and "Us" to take actions that only specific existing entities, not open-ended categories of potential future entities, can take. For example, the agreement states that its provisions can only be "amended, severed or waived" by a "written agreement between You and us." JA319. If such amendment or waiver required the written agreement of anyone who might in the future become a parent, subsidiary, affiliate, assignee or successor of OneMain, then the arbitration agreement would be impossible to amend or waive.

In 2015, then, Zirpoli agreed to arbitrate with a category of specifically-identifiable entities currently or previously affiliated with OneMain (the "known

We/Us") and a category of entities whose identities were not yet known but who could be identified in the future based on an objective definition (the "unknown We/Us"). Midland cannot, and does not, claim to be a member of the "known We/Us." And it can only claim membership in the "unknown We/Us" if, at some point after 2015, it became able to satisfy the objective definition of parent, subsidiary, affiliate, assignee or successor. As described in parts I-B and IV below, it never did.

### B.    Zirpoli Did Not Form an Agreement to Arbitrate with Midland in 2016 or Anytime Thereafter.

As the party seeking to prove the existence of an arbitration agreement, Midland had the burden of offering evidence of the circumstances under which the purported contract was formed. *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161–62 (3d Cir. 2009) (party seeking arbitration under FAA has burden analogous to party seeking summary judgment).

Here, Midland claims it is authorized to compel arbitration as an assignee of OneMain. JA391–93.[8] Thus, it is Midland, not Zirpoli, who made the validity of the OneMain-Midland assignment an integral element of the contract formation inquiry.

---

[8] Midland offered no evidence that it ever approached Zirpoli directly about forming a contract to arbitrate future disputes after it attempted to purchase the Loan. Indeed, when Midland sought to collect the balance of the Loan from Zirpoli in 2018, it did so in Franklin County magisterial court, not in arbitration. JA37 ¶¶13–14.

In essence, Midland argued that because it obtained all rights to Zirpoli's Account through the November 2016 Bill of Sale, it could stand in OneMain's shoes as a party to the Zirpoli-OneMain arbitration agreement. *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001) ("[A]ssignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held . . . ."). Accordingly, it was entirely appropriate for the district court to focus on the assignment of OneMain's rights to Midland in determining "whether an arbitration agreement exists between Zirpoli and Midland." JA12.[9]

The Eighth Circuit's opinion in *Koch v. Compucredit Corp.* is instructive. As here, a debt buyer purchased an account (in *Koch*, a credit card account) that was governed by an arbitration agreement. 543 F.3d at 462. As here, the debt buyer attempted to collect on the account, leading to a dispute with the debtor plaintiff. *Id.*

---

[9] Midland argued below that even if the assignment of the Account were invalid because it was done without Department of Banking permission, in violation of the CDCA, that determination of invalidity would not affect OneMain's rights to compel arbitration, which were separately assigned to Midland. JA396–97. The district court rejected this "separate assignment" argument, JA25–26, and Midland has not raised it in its opening brief. It has accordingly been waived. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 n.2 (3d Cir. 2001). The argument fails on its merits in any event, for the Bill of Sale purported to assign the "Accounts" wholesale, and contained no severability clause. JA352. Moreover, the PSA specified that Midland had no property interest in account documents like the arbitration agreement, and could only use account documents for limited purposes not including moving to compel arbitration. JA105, 330 6.2(b).

at 462–63. And the Eighth Circuit, like the district court here, found the validity of the assignment from the original creditor to the debt buyer was the dispositive question it needed to answer to determine if an arbitration agreement existed between the plaintiff and debt buyer. *Id.* at 465 ("[T]he existence of an arbitration agreement *between the parties* depends on whether the assignment . . . was valid." (emphasis added));[10] *see also Am. Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 823, 828–29 (2d Cir. 1968) (remanding so district court could determine "whether there was an agreement to arbitrate between" plaintiff and purported assignee where validity of assignment was at issue).

Midland argues that the district court impermissibly focused on the validity of the OneMain-Midland assignment *instead of* determining the existence of an agreement to arbitrate, Appellant Br. 15–16, but what the court actually did was assess the assignment's validity *in order to* resolve the threshold "existence issue," JA13. The district court correctly answered "no" to the assignment validity question under Pennsylvania law, *see* part IV below, and in so doing it reasoned consistently with the Supreme Court's severability doctrine.

---

[10] The court concluded that the assignment in *Koch* was valid, 543 F.3d at 465–66, but for the reasons described in part IV below, the assignment here was not.

**C.    The Severability Doctrine Is Not Implicated Here Because Plaintiff Did Not Challenge the Validity or Existence of Any Container Contract.**

This Court recently discussed the Supreme Court's "severability doctrine" at length in *MZM Construction Co., Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 397–98 (3d Cir. 2020). That doctrine began in 1967 with *Prima Paint*, in which the Supreme Court held that if an arbitration agreement was contained in a larger container contract, a specific challenge that the arbitration agreement in the contract was induced by fraud must be decided by the court because it implicated the "making of the agreement for arbitration" under § 4, while an argument that the container contract as a whole was induced by fraud was for the arbitrator to decide. 388 U.S. at 402–06. In *Buckeye*, the Supreme Court extended that severability doctrine to contract validity challenges under § 2 of the FAA, noting that courts may decide challenges to "the validity of the agreement to arbitrate[,]" while arbitrators must decide challenges to the validity of "the contract as a whole, either on a ground that affects the entire agreement . . . or on the ground that the illegality of one of the [container] contract's [other] provisions renders the whole contract invalid." 546 U.S. at 444–46. The Court, however, noted an exception to the severability principle, clarifying that it "addresse[d] only" the validity question and not the distinct question of "whether any agreement between the alleged obligor and obligee was ever concluded." *Id.* at 444 n.1.

20

Midland correctly sets forth the distinction this Court drew in *MZM* between challenges to a container contract's validity, which are for the arbitrator to decide, and challenges to a container contract's existence or formation, which implicate "the making of the [embedded] agreement to arbitrate" and thus go to the court. *Id.* at 445; Appellant Br. 11–12. But this discussion is purely academic because, as Midland admits, the Bill of Sale purportedly assigning the Account is not a container contract. *See* Appellant Br. 13 (describing the Note as the "actual container contract" for the arbitration agreement).

According to Midland, Zirpoli's challenge to the legality of the OneMain-Midland assignment is "no different than the *Buckeye* plaintiffs' challenge to the legality of their loan contracts under Florida law." Appellant Br. 15. But while the challenges may share superficial commonalities—both involve high-interest lending, an arbitration clause, and a challenge to a contract as illegal and void—they differ on the only question that matters to severability.

*Buckeye* extended *Prima Paint*'s severability principle to challenges based on validity, severing challenges going directly to an arbitration clause's validity (which are for the court to decide) from other validity challenges to the contract containing the arbitration clause (which are not). 546 U.S. at 444–46. But if a contract does not contain an arbitration clause at all, there is nothing to sever, and no distinction to be

made between arbitration-related and non-arbitration-related challenges to that contract.

Thus, the key question that determines whether the severability doctrine applies is whether the contract whose validity is challenged contains an arbitration provision. In *Buckeye*, the answer was "yes." *Id.* Here, the answer is "no." In fact, the contract Zirpoli challenged (the OneMain-Midland Bill of Sale) does not involve the same contracting parties as either the arbitration agreement that the parties agree exists (the arbitration agreement between Zirpoli and OneMain) or the arbitration agreement whose formation is in dispute (the one Midland claims exists between itself and Zirpoli). Thus, *Buckeye* is inapposite both because it involved a validity challenge to a container contract—which this case does not—and because the validity challenge involved a contract between the same two parties as the embedded arbitration clause—also not the case here.

The other authorities cited by Midland on severability are equally inapposite. The plaintiff in *SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 269–70 (3d Cir. 2013), challenged a water supply agreement it had signed, alleging the agreement should be declared void as the product of coercion; that agreement contained an arbitration provision and was thus a container contract. And in *CD&L Realty LLC v. Owens Ill., Inc.*, 535 F. App'x 201, 202–04 (3d Cir. 2013), the same Purchase and Sale Agreement the plaintiff argued was void contained the arbitration

agreement, whereas here, the OneMain-Midland assignment the district court declared void was separate from, and did not contain, an arbitration agreement.[11]

* * *

Because OneMain did not validly assign its rights to Zirpoli's Account to Midland, and because Midland offers no other basis besides assignment for how it may compel Zirpoli to arbitrate, the district court was correct to conclude no arbitration agreement was ever formed between Zirpoli and Midland, and this Court should affirm the district court's order on that ground. Alternatively, and for the same reasons described above, Midland is not a "party" to the arbitration agreement between Zirpoli and OneMain, and thus was not authorized to compel arbitration under § 4 of the FAA.

## II. Alternatively, the FAA Does Not Permit Midland to Petition a Court to Compel Arbitration Under OneMain's Arbitration Agreement with Zirpoli Because Midland Is Not a "Party" to That Agreement.

Midland lacked statutory authorization under the FAA to petition the district court for an order compelling arbitration. That right is limited to parties to the

---

[11] Two district courts recently relied on *Buckeye* to find the severability doctrine applies in cases with analogous facts to this one. *See Bey v. Crown Asset Mgmt., LLC*, No. 2:20-CV-00715-CCW, 2021 WL 4078657, at *4 (W.D. Pa. Sept. 8, 2021) (treating assignment as container contract for arbitration agreement); *Neff v. Portfolio Recovery Assocs., LLC*, No. 2:19-CV-1028-DSC, 2021 WL 4958690 (W.D. Pa. Oct. 26, 2021) (same). Obviously, these opinions are not binding, and their errant analysis underscores the need for this Court to provide guidance on the interplay between the severability doctrine and assignments.

arbitration agreement—which Midland is not. Accordingly, the district court erred in assuming jurisdiction over Midland's motion to compel, and this Court should vacate the district court's order and remand with instructions that the district court refuse to entertain any further non-party motions to compel arbitration.

### A.    The FAA Limits the Right to Petition a Court to Compel Arbitration to a "Party" to the Arbitration Agreement.

Midland's entire argument "overlooks the necessarily antecedent statutory inquiry" of whether it can invoke § 4 in the first place. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019). "While a court's authority under the [FAA] . . . may be considerable, it isn't unconditional." *Id.* at 537. Indeed, just as the Court clarified in *New Prime* that "a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2," *id.*, so too must courts first determine whether one moving to compel arbitration "falls within" the definition of "party" under § 4. *Cf. Yeomans v. World Fin. Grp. Ins. Agency, LLC*, No. 20-16937, 2021 WL 5356537, at *2 (9th Cir. Nov. 17, 2021) (affirming denial of motion for jury trial on existence of arbitration agreement by non-breaching defendants because "[o]nly 'the party alleged to be in default' of the arbitration agreement may demand a jury trial under [§ 4]").

Here, the text of the FAA, precedent, and common sense indicate that the term "party" in § 4 means a party to the written agreement to arbitrate under which said party seeks to compel arbitration. Any other reading "resists this straightforward

understanding" of the congressional text, *New Prime*, 139 S. Ct. at 538, and must be rejected.

### 1. "Party" Under § 4 Means a Contractual Party to the Arbitration Agreement.

"[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014). "[W]hen the language was used in that way at the time of the statute's adoption," *Yellen v. Confederated Tribes of Chehalis Reservation*, 141 S. Ct. 2434, 2445 (2021), "a common-law term of art should be given its established common-law meaning," *Johnson v. United States*, 559 U.S. 133, 139 (2010).

"Party" was a "technical word" which "ha[d] a precise meaning in legal parlance" when Congress enacted the FAA in 1925, *Party*, Black's Law Dictionary (2d ed. 1910); *accord* Dictionary of Terms and Phrases Used in American or English Jurisprudence 251 (Benjamin Vaughan Abbott ed., 1879) [hereinafter Abbott], as is evidenced by the fact that the term appears in numerous legal dictionaries from that era, *cf. New Prime*, 139 S. Ct. at 539 (a term's absence in contemporaneous legal dictionaries is an indicator that it was not a specialized term of art); *Carpenter v. United States*, 138 S. Ct. 2206, 2238 (2018) (Thomas, J., dissenting) (same).

These dictionaries define the term both as a party to a contract, and as a party to a case, i.e., a litigant. *See, e.g.*, Baldwin's Century Edition of Bouvier's Law Dictionary 891–92 (William Edward Baldwin ed., 1926) [hereinafter Bouvier's] (defining plural as "[t]hose who take part in the performance of an act, as, making a contract, carrying on an action"); *Party*, Ballentine's Law Dictionary (1st ed. 1916) (defining as "[o]ne of two or more persons entering into a contract" as well as "one directly interested in the subject matter of an action, who has the right to defend or control the proceedings or appeal from the judgment"); The Pocket Law Lexicon 260 (Joseph E. Morris ed., 4th ed. 1905) (defining as "a person who takes part in a legal transaction, e.g., an agreement or deed, or in a legal proceeding"); A Concise Law Dictionary for Students and Practitioners 203 (Percy George Osborn ed., 1927) (defining as "[a] person who takes part in a transaction or legal proceeding").[12]

Of the two widely-understood technical meanings of the term "party" in 1925, § 4 of the FAA refers to contractual parties rather than litigants. To ascertain the

---

[12] Although *Black's Law Dictionary* defines "party" more generally, as "[a] person concerned or having or taking part in any affair, matter, transaction, or proceeding, considered individually," *Party*, Black's Law Dictionary (2d ed. 1910), the Supreme Court has instructively circumscribed its inquiry to the two consistently-provided technical definitions when determining the meaning of the term "parties" in the FAA. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 n.4 (2009); *see also ADT, L.L.C. v. Richmond*, No. 21-10023, 2021 WL 5228520, at *2 (5th Cir. Nov. 10, 2021) (finding that a broad reading of "parties" in § 4 "would make no textual sense").

meaning of ambiguous terms, courts look to the context in which the terms appear, *Shular v. United States*, 140 S. Ct. 779, 785 (2020), and "us[e] traditional tools of statutory interpretation[] in order to confirm their assumptions about the 'common understanding' of words," *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 n.5 (2021). Although the term "party" "is nowhere defined in the statute and [] can mean different things depending on context," *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176–77 (2021), the FAA provides several "textual clues" confirming that a "party" in § 4 means a contractual party to an arbitration agreement.

Section 4 states in relevant part that:

> [a] *party* aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under [T]itle 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4 (emphasis added).

The most natural reading of "party" in that sentence is that it refers to a contractual party: that was one of the two technical meanings of the term in 1925, and the sentence specifically refers to such a party being aggrieved by a breach of contract. Reading the term as referring to litigants is far less natural. Unlike § 3, which begins "[i]f any suit or proceeding be brought in any of the courts of the

United States upon any issue referable to arbitration under an agreement in writing for such arbitration," 9 U.S.C. § 3, § 4 neither references nor presumes extant legal action. Even though litigation must necessarily already be underway in the context of § 3—because a stay can only occur in that context—Congress nonetheless specified that § 3 only applies where a suit has been filed. Congress made no such reference in § 4. To the contrary, it considers litigation in purely hypothetical terms: a party "may" petition "any" court that "would" have jurisdiction over the action between the parties. 9 U.S.C. § 4. The "litigant" meaning of "party" thus does not fit § 4's litigation-optional context.

Although this case presents only the question of which sort of "party" can compel arbitration under § 4, other uses of "party" in § 4 are also best understood as meaning a contractual party rather than a litigant.[13] Section 4 states that "[f]ive days'

---

[13] *See Arthur Andersen*, 556 U.S. at 630 n.4 ("[I]dentical words and phrases within the same statute should normally be given the same meaning." (citation omitted)). However, the Court in *Arthur Andersen* used this canon of statutory construction to support a conclusory piece of dicta that has never been cited by any federal or state court since—probably because it is incorrect. *Id.* (describing the "controversy between the parties" language in § 4 as "unambiguously refer[ring] to adversaries in the action" and reasoning that § 3 should be construed similarly). As explained above, the most natural reading of § 4 is that it refers to a "controversy between the [contractual] parties." And, even if the Court were correct that one use of "parties" in § 4 "unambiguously" referred to litigants, the "same meaning" canon of construction would not apply because the text itself would "unambiguously" point towards two different meanings of the term in different parts of § 4. Indeed, § 9 appears to use the term in this manner. *See* 9 U.S.C. § 9 (referring to a "party to the

notice in writing of such application [to compel arbitration] shall be served upon the party in default." *Id.* Because there are no parties *qua* litigants before a legal person makes a petition to the court for an order to compel arbitration, the "party" in default, who must be served with notice at least five days *before* that petition is made, cannot reasonably be understood as anything other than a party to the contract. Section 4 also states that a "party" may petition a federal district court which "would have jurisdiction" over "a suit arising out of the controversy between the parties." *Id.* Again, the most natural reading of the phrase "suit arising out of the controversy between the parties" is that it refers to contractual parties, because a theoretical suit would arise out of a controversy between those parties, who are not yet in court, rather than a controversy between litigants, who already are.[14] And while a suit between the contractual parties may still be theoretical when a § 4 petition is filed, a

_____

arbitration" and an "adverse party," on the one hand, and "the parties in their agreement" and "the agreement of the parties," on the other).

[14] All subsequent references to "parties" in § 4 occur in a context where petitioner has already presented its petition to a federal district court, so those instances present greater ambiguity. However, absent compelling reasons to do otherwise, "identical words and phrases within the same statute should normally be given the same meaning." *Arthur Andersen*, 556 U.S. at 630 n.4. Because each of the initial references to "parties" in § 4 means parties to an arbitration agreement, that meaning should govern the more ambiguous, subsequent uses absent a compelling reason why it should not. *Cf. Sullivan v. Stroop*, 496 U.S. 478, 481–84 (1990) (finding a narrower "construction [of an ambiguous term] is amply supported by the text of the statute" and applying that construction to another section of the statute because the two "operate together closely").

29

controversy between those parties would not be, as § 2 also contemplates a controversy "arising out of" the contract calling for arbitration.

Uses of the term "party" outside of § 4 also point towards the term meaning a contractual party. For example, § 5 speaks of "the [arbitration] agreement" and "any *party thereto*." 9 U.S.C. § 5 (emphasis added). It similarly refers to "the application of either party to the controversy," *id.*, which, as discussed above, is most naturally read to mean a party to the contract which the "existing controversy aris[es] out of," *id.* § 2, rather than a litigant. Indeed, Congress appears to have added specific, additional language in the instances where it could plausibly have been referring to "parties" as litigants in court or arbitration. *See id.* § 3 (placing the term in the context of "any suit or proceeding . . . brought in any of the courts of the United States"); *id.* § 9 (using the terms "party to the arbitration" and "adverse party"); *id.* § 10 (using the term "party to the arbitration"); *id.* § 11 (same).

### 2.    Supreme Court Precedent Forecloses Reading "Party" as Referring to a Litigant and Strongly Supports That It Means a Contractual Party.

Understanding "party" as referring to a litigant, rather than a contractual party, is not only contrary to the text of the FAA, but also to Supreme Court precedent. In *Vaden v. Discover Bank*, the Supreme Court held that a petitioner under § 4 may "ask a federal court to compel arbitration without first taking the formal step of initiating . . . a federal-question suit—that is, without seeking federal adjudication

of the very questions it wants to arbitrate rather than litigate." *Goldman v. Citigroup Glob. Mkts. Inc.*, 834 F.3d 242, 253 (3d Cir. 2016) (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 65 (2009)). Indeed, *Vaden* acknowledged there may not be any extant litigation in any court—state or federal—when a § 4 petition is filed. 556 U.S. at 63 n.13. Because the Supreme Court expressly disavowed that there must be litigants when a § 4 petition is made, "party" cannot mean a litigant in this context.

Understanding "party" as meaning a party to a written agreement to arbitrate also makes sense given the Supreme Court's analysis of analogous state laws in *Vaden*. There, the Court described a Maryland statute providing for specific performance of arbitration agreements as "nearly identical to § 4." *Vaden*, 556 U.S. at 71. The Maryland statute read: "If *a party to an arbitration agreement* . . . refuses to arbitrate, the *other party* may file a petition with a court to order arbitration." *Id.* (quoting Md. Code Ann., Cts. & Jud. Proc. § 3-207) (emphases added). It strains credulity to think the Court would not have mentioned that "party" means something different under the FAA than the Maryland statute after describing the two as "nearly identical." *Vaden*, 556 U.S. at 71.[15]

_____

[15] The FAA also "follows the lines of the New York arbitration law enacted in 1920," S. Rep. No. 68-536, at 3 (1924), which governed controversies "arising *between the parties* to the contract," Arbitration Law, ch. 275, § 2, 1920 N.Y. Laws 804, 804 (emphasis added). Similar to the Maryland statute, the equivalent of § 4 contained in the New York law stated that "[i]f . . . a written contract providing for arbitration was made . . . and there is a default in the performance thereof, the court, or the judge

Further, this interpretation of "party" in § 4 is consistent with the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, decided during the same term as *Vaden*, where the Court found the term "parties" in § 3 referred to "litigants" rather than contractual parties. 556 U.S. 624, 632 (2009). This conclusion derived from fundamental differences between §§ 3 and 4. Section 3 "allows litigants *already in federal court* to invoke agreements," *id.* at 630 (emphasis added), while § 4 contemplates that parties to a contract *who are not yet litigants* will petition a court to compel arbitration, *see Vaden*, 556 U.S. at 63 n.13, 65.[16]

---

thereof, shall make an order summarily directing *the parties to the contract . . .* to proceed with the arbitration in accordance with the terms thereof." *Id.* § 3, 1920 N.Y. Laws 804, 805 (emphasis added).

[16] At least one other circuit also reads "party" under § 4 as a party to the arbitration agreement, relying in part on *Vaden*. *See Hermès of Paris, Inc. v. Swain*, 867 F.3d 321, 324 (2d Cir. 2017) ("[Section 4] of the FAA provides for jurisdiction over a suit arising out of a controversy between 'the parties,' which 'most sensibly refers to those persons who are *parties to the arbitration agreement*—and who therefore can be named in the petition to compel arbitration.'") (emphasis added) (quoting *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 445 (2d Cir. 1995)); *id.* at 325–26 (holding that *Vaden* did not overrule *Distajo*); *see also ADT*, 2021 WL 5228520, at *4–5 (citing *Swain* and *Distajo* with approval and noting that the plaintiff had "agreed to arbitrate its claims against" the defendant that sought to compel arbitration under § 4). The Fifth Circuit in *ADT* went on to note that the plaintiff had brought state-law claims against another defendant but that defendant was not a party to the arbitration agreement or to the § 4 petition. *Id.* at *5. In *Vaden* and *ADT*, the only parties to the § 4 petition were also parties to the agreement to arbitrate, affording no opportunity to explicitly reach the question decided by the Second Circuit in *Distajo* that only a party to the arbitration agreement can bring a petition under § 4.

### 3. The Distinction Federal Courts Have Long Drawn Between the Judicial Power Exercised Under §§ 3 and 4 Also Supports Reading "Party" as a Party to the Arbitration Agreement.

Requiring federal courts to inquire into whether one seeking to compel arbitration is a "party" to the arbitration agreement in question is not only consistent with textual differences between §§ 3 and 4, but is also supported by the distinction that federal courts have long drawn between the scope and type of judicial power conferred by each section. The Supreme Court has recognized for nearly a century that those two provisions are not identical in scope. *See Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*, 293 U.S. 449, 453 (1935) (explaining that "there is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with section 4 of the act," but that "[t]here is, [on] the other hand, strong reason for construing the clause as permitting the federal court to order a stay even when it cannot compel the arbitration").

This disjunction between a court's ability to stay, on the one hand, and compel arbitration, on the other, made sense in 1925 and makes sense today. In *Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.*, the Second Circuit explained that "it is important to differentiate between [the two sections] of the Act" because § 3 provides petitioners with "a stay order of a kind long familiar in common law, equity and admiralty actions," while § 4 grants the more extraordinary remedy of "specific performance." 126 F.2d 978, 986–87 (2d Cir. 1942).

33

> There is a well recognized [sic] distinction between such a stay and specific performance: The first merely arrests further action by the court itself in the suit until something outside the suit has occurred; but the court does not order that it shall be done. The second, through the exercise of discretionary equity powers, affirmatively orders that someone do (or refrain from doing) some act outside the suit.

*Id.* at 987. Discussing the power of specific performance in § 4, the court opined that "a court, when exercising equity powers, should do so on the basis of a fully informed judgment as to all the circumstances." *Id.* Although the distinction between a court's equitable and legal powers is less important now than it was in 1925, when the FAA was enacted, or in 1935, when the Supreme Court first distinguished between §§ 3 and 4 in *Shanferoke*, the Second Circuit deemed it worthy of note when *Kulukundis* was decided in 1942, four years after the Federal Rules of Civil Procedure merged the equity, law, and admiralty sides of federal courts. And the *Kulukundis* court's point about the power of specific performance remains just as salient today as in 1942: where a court is petitioned under § 4 to *compel* arbitration, it should at least "do so on the basis of a fully informed judgment" as to whether the person seeking to compel arbitration is a "party" to the contract. *Id.*

Section 4's provision of the extraordinary remedy of specific performance supports reading "party" as referring to a contractual party for yet another reason. "A party aggrieved by the alleged failure, neglect, or refusal of *another* to arbitrate under a written agreement for arbitration" may avail itself of the § 4 specific performance remedy. 9 U.S.C. § 4 (emphasis added). In isolation, the term "another"

may be understood as either referring specifically to the aforementioned "party," or generally to some other person. *See* Webster's New International Dictionary of the English Language 92 (W. T. Harris & F. Sturges Allen eds., 1923) (defining "another" both as "[o]ne more, in addition to a former number; a second or additional one, similar in likeness or in effect" and as "[a]ny or some other; any different person, indefinitely; any one else; some one else"). However, this facial ambiguity is quickly resolved in light of the limits of specific performance in 1925.

The term "another" is best understood as referring to "another [party to the arbitration agreement]," 9 U.S.C. § 4, because, at the time the FAA was enacted, specific performance could only be had against parties to a contract. In the first edition of his treatise on contracts, published five years before the FAA was enacted, Professor Williston explained under the section heading "[a]gainst whom specific performance may be sought," that "[s]trictly a contract can be enforced either in law or in equity *only against the party who entered into it*." 3 Samuel Williston, The Law of Contracts § 1453 (1st ed. 1920) (emphasis added). The term "another" in § 4 cannot refer to its more general definition because specific performance could not be had against individuals who were not parties to the contract. Accordingly, because the term "another [party]" means a contractual party, the antecedent "party" to which "another [party]" refers—the one which is entitled to petition for an order to compel arbitration under § 4—must be a contractual party as well.

**B.    Midland Is Not a "Party" to the Zirpoli-OneMain Arbitration Agreement as That Term Was Understood in 1925.**

Because Midland did not contract with Zirpoli to arbitrate, and Midland is not a valid assignee of OneMain's agreement to arbitrate with Zirpoli, Midland would not have been a "party" to the arbitration agreement as that term was understood in 1925. The contractual meaning of "party" was limited to those "with whom the deed or contract is actually made or entered into." Abbott at 251; *see also* Bouvier's at 891–92 (defining term's contractual meaning as "[t]hose who take part in the performance of an act, as, making a contract"); *Party*, Ballentine's Law Dictionary (1st ed. 1916) (defining term's contractual meaning as "[o]ne of two or more persons entering into a contract"). Midland was not a "party" to the agreement to arbitrate between OneMain and Zirpoli when the contract was formed. Nor has Midland become a "party" to that agreement since. Although "[n]ew parties may be made to contracts already in existence, by novation, *assignment*, and indorsement," Bouvier's at 892 (some emphases omitted), for reasons discussed below in part IV, no valid assignment of OneMain's contractual rights to Midland ever occurred.

**C.    Whether Midland Is a "Party" Within the Meaning of § 4 Goes to the District Court's Jurisdiction to Hear Midland's Motion to Compel and This Court's Jurisdiction to Hear Its Interlocutory Appeal.**

Midland's motion to compel in the district court, and its interlocutory appeal to this Court, are riddled with jurisdictional deficiencies. Because Midland is not a

36

"party" to OneMain's arbitration agreement with Zirpoli, it was not authorized to petition the district court under § 4 in the first place. The district court also lacked jurisdiction over Midland's motion to compel because there is no "controversy between the parties" to the arbitration agreement—OneMain and Zirpoli—as required by § 4.

This Court's appellate jurisdiction is correspondingly limited. Where the lower court erroneously takes jurisdiction of an unauthorized petition, the role of the appellate court is limited to correcting that error. Thus, this Court should vacate the district court's order, and remand with instructions clarifying that lower courts may not entertain motions to compel by non-parties to an arbitration agreement.

### 1. The District Court Lacked Jurisdiction over Midland's Motion to Compel Arbitration.

Appellate courts have a "special obligation" to satisfy themselves of their own jurisdiction, as well as "that of the lower courts in a cause under review." *Farina v. Nokia Inc.*, 625 F.3d 97, 109–10 (3d Cir. 2010). District courts lack jurisdiction over unauthorized petitions. *See United States v. Ubani*, 582 F. App'x 333, 333 (5th Cir. 2014) ("Because the motion was unauthorized, the district court lacked jurisdiction."); *Dandar v. Commonwealth*, No. 1:02-CV-00222-BR-SPB, 2017 WL 919374, at *1 (W.D. Pa. Mar. 8, 2017) ("[T]he Court lacks subject matter jurisdiction over the unauthorized petition.").

The court below lacked jurisdiction over Midland's motion to compel[17] for two reasons. First, § 4 limits the right to petition to a "party" to an arbitration agreement and Midland was not a "party"—meaning its motion to compel was unauthorized by law. Second, a "party" may only petition a district court under § 4 when that court, "save for [the arbitration] agreement, would have jurisdiction under [T]itle 28, in a civil action or in admiralty of the subject matter of a suit arising out of the *controversy between the parties*." 9 U.S.C. § 4 (emphasis added). As explained above, the best reading of the term "parties" in that phrase is that it refers to contractual parties to the arbitration agreement. Here, there is no controversy between Zirpoli and OneMain—the parties to that agreement. Without a controversy between them, the district court could not assess whether it "would have jurisdiction" over a hypothetical suit arising out of that hypothetical controversy. *Id.* Thus, Midland's motion to compel was unauthorized for two distinct, but related, reasons—both of which are fatal to the district court's jurisdiction over it.

### 2. This Court's Jurisdiction Is Limited to Correcting the District Court's Error in Treating Midland's Motion as a § 4 Petition and Assuming Jurisdiction over It.

Because the district court lacked jurisdiction to entertain Midland's unauthorized motion, this Court's jurisdiction to consider Midland's appeal is highly

---

[17] Midland did not specifically invoke § 4 in its motions to compel arbitration. JA73, 305.

circumscribed. On review of a motion over which the district court lacks jurisdiction, an "[appellate] court's jurisdiction is limited to correction of the error of the lower court in entertaining the motion." *Ubani*, 582 F. App'x at 333; *accord Montgomery v. Goodwin*, 841 F. App'x 700, 702 (5th Cir. 2021). Where permission to appeal is erroneously granted, or not required, appellate courts properly vacate the order below upon review. *See Martinez v. Evans*, 585 F. App'x 389, 389–90 (9th Cir. 2014); *Flatow*, 305 F.3d at 1253 ("The district court, therefore, was without jurisdiction to hear or decide the question raised by [plaintiff]'s motion, and the district court's opinion on the merits of his claim should be vacated."); *Jackson v. Champion*, 166 F.3d 1221, 1221 (10th Cir. 1998) (unpublished table decision).[18]

---

[18] To the extent that this Court's jurisdiction over Midland's interlocutory appeal is grounded in the district court's order denying Midland's motion to compel rather than its motion to stay, which was denied as moot, JA27, this Court is also without jurisdiction to entertain Midland's appeal. "The jurisdiction of the Courts of Appeal is limited to that conferred by statute," *Vineland Chem. Co. v. U.S. E.P.A.*, 810 F.2d 402, 405 (3d Cir. 1987), and "there is no 'right' to appeal a non-final order" absent a statutory right or application of the collateral order doctrine, *Hodge v. Bluebeard's Castle, Inc.*, 392 F. App'x 965, 972 (3d Cir. 2010). Midland has no right to an interlocutory appeal under § 16(a)(1)(B) because that provision only authorizes such an appeal from an order "denying a petition under section 4." Although Midland moved to compel arbitration, it did not make a "petition under section 4." Such petitions "shall be made and heard" as motions, 9 U.S.C. § 6, but "they are still a separate animal, as opposed to the . . . motion itself," Oral Argument at 38:16, *Badgerow v. Walters*, No. 20-1143, https://www.oyez.org/cases/2021/20-1143 (statement of Roberts, C.J.). Since only a "party" has a statutory route to compelling arbitration under the FAA, and Midland is not a "party" within the meaning of § 4, there is no denial of a "petition under section 4" from which it can make an interlocutory appeal through § 16(a)(1)(B). Midland has no statutory right to move

\*      \*      \*

Midland was not a "party" to Zirpoli's arbitration agreement with OneMain and lacked authority to move for specific performance of that agreement under § 4. Because the district court erred in accepting jurisdiction over that unauthorized motion, this Court should vacate the order on appeal and remand with instructions that no further unauthorized motions to compel from non-parties be considered.

### III. The Presence of a Delegation Clause in Zirpoli's Arbitration Agreement with OneMain Did Not Affect the District Court's Jurisdiction Over the Contract Formation Issues Involving Midland.

Assuming *arguendo* that the district court had jurisdiction over Midland's motion to compel,[19] the presence of a delegation clause in the arbitration agreement between Zirpoli and OneMain did not affect that jurisdiction for two reasons: Zirpoli's challenge went to contract formation, an issue that cannot be delegated; and there was no clear and unmistakable evidence in the Zirpoli-OneMain agreement of an intent to arbitrate arbitrability questions with non-parties.

---

to compel outside the FAA, and no statutory right to an interlocutory appeal unless its denied motion to compel qualifies as a § 4 petition.

[19] Alternatively, for the reasons described above in part II, Midland, as a non-party, lacked authority under § 4 to petition the district court to enforce any provision in the Zirpoli-OneMain arbitration agreement, including its delegation clause. Because Midland is not a "party" to the arbitration agreement between Zirpoli and OneMain, it is no more a party to the delegation clause within that agreement, and cannot use § 4 to seek specific performance by Zirpoli of that "antecedent agreement" to arbitrate. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69–70 (2010).

First, as described above in part I, Zirpoli challenged the existence of any arbitration agreement between himself and Midland. As this Court recently held, such challenges to contract formation can never be delegated, even if language in the contract whose formation is in question purports to do so. *MZM Construction Co.*, 974 F.3d at 401 (grounding its conclusion in the text of § 4 and its requirement that the court be "satisfied" that an arbitration agreement "exists" before compelling arbitration)*; see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (court must "always" decide whether an agreement to arbitrate was formed); *id.* at 298–99 (discussing disputes over a clause's applicability or enforceability separately from disputes about its formation, and qualifying that the former but not the latter types of disputes may be delegated to an arbitrator). As a result, the district court was correct in deciding, rather than delegating, the question of whether an arbitration agreement exists between Zirpoli and Midland. JA302–03; *see Rent-A-Center*, 561 U.S. at 70 n.2 (quoting *Buckeye*, 546 U.S. at 444 n.1) (providing the same caveat as the Court in *Buckeye* that its requirement of an arbitration-specific challenge was limited to issues of contract validity and not the "different . . . issue [of] whether any agreement between the parties 'was ever concluded'").

Second, Zirpoli *did specifically challenge* the existence of a delegation clause with Midland on the same ground that he challenged its purported container contract—that OneMain's rights under the Account were never validly assigned to

41

Midland, and thus no agreement to arbitrate disputes between Zirpoli and Midland ever came into existence. JA282. This specific challenge has even greater force given that "clea[r] and unmistakabl[e]" evidence is required to overcome the usual presumption that courts decide threshold issues of arbitrability. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Even if this Court or a Pennsylvania state court ultimately decides the state-law issues discussed in part IV regarding the validity of the OneMain-Midland assignment in Midland's favor, the legally questionable nature of that assignment nonetheless precludes a finding that the OneMain arbitration agreement with Zirpoli evinced clear and unmistakable evidence of an intent to delegate threshold disputes of arbitrability *with Midland* to an arbitrator. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126–28 (9th Cir. 2013) (plaintiff's agreement with dealership did not evince clear and unmistakable evidence of an intent to delegate arbitrability disputes with non-signatory Toyota to an arbitrator).

For either or both of these reasons, this Court should conclude that the presence of a delegation clause in Zirpoli's arbitration agreement with OneMain has no bearing on whether an arbitration agreement exists between Zirpoli and Midland. The district court either properly decided this non-delegable, and non-delegated, contract formation issue, or it lacked jurisdiction to decide it because Midland is not

a "party" within the meaning of § 4. Either way, the delegation clause is irrelevant to the district court's authority and the issues this Court must decide on appeal.

## IV. OneMain's Purported Assignment to Midland Was Illegal and Void Under Pennsylvania Law.

### A. OneMain Could Not Sell Its Contract with Zirpoli to Midland Because Midland Is Not Licensed Under the CDCA.

Midland mischaracterizes the legal question of whether the CDCA applies to OneMain's attempted sale of the Account. The correct question is not whether *Midland* was subject to the CDCA, but whether *OneMain* could sell the Account to Midland. The answer is clear: OneMain could not. And what OneMain could not sell, Midland could not buy.

The CDCA commands that "[a] licensee may not sell contracts to a person or corporation not holding a license under this act without the prior written approval of the Secretary of Banking." 7 P.S. § 6214.I.[20] The Department of Banking's implementing regulations clarify that a licensee is also barred from "otherwise dispos[ing]" of such contracts without government approval. 10 Pa. Code § 41.6(a). This regulation carries the force of law. *See Borough of Pottstown v. Pa. Mun. Ret.*

---

[20] The CDCA defines "[c]ontract[s]" as "any . . . form of negotiable or nonnegotiable instrument evidencing an agreement to pay a sum certain in money at a fixed or determinable time, either by a single payment or by stated installments." 7 P.S. § 6202. The district court implicitly found that the Account fell within this definition. *See* JA20–21. This was correct: the Account is an installment loan between Zirpoli and OneMain. *See* JA315–17.

*Bd.*, 712 A.2d 741, 743 (Pa. 1998) ("[S]ubstantive regulations, sometimes known as legislative rules, . . . have the force of law, and enjoy a general presumption of reasonableness." (citations omitted)).

The district court correctly held that OneMain could not (and did not) sell the Account to Midland. It was undisputed that OneMain was a CDCA licensee, that Midland was not, and that the Secretary of Banking did not approve the purported sale of the Account. JA6.[21] Accordingly, the district court correctly concluded that the CDCA barred OneMain, a CDCA licensee, from selling the Account, a contract, to Midland, a non-bank without a CDCA license or the requisite approval, to effectuate that assignment. JA20–21.[22]

### B.    Midland's Possession of Other Licenses Is Irrelevant to Whether OneMain Could Sell the Account to Midland.

Compounding its characterization error, Midland contends it is exempt from the CDCA because it is licensed under Chapter 62 of the Consumer Credit Code to collect indirect, dealer-made car loans. Appellant Br. 18, 23–24. Midland relies on

---

[21] The district court found it "undisputed that Zirpoli took out a CDCA loan with OneMain carrying an interest rate of 26.91 percent." JA20. Throughout its opinion, the district court treated OneMain as a CDCA licensee. Zirpoli also introduced two exhibits showing that OneMain is a CDCA-licensed entity. JA222–29, 514–17.

[22] Midland warranted in the PSA that it had "obtained" the necessary "authorizations[,]" JA103 (4.1), 328 (4.1), but failed to do so.

§ 6217,[23] which states that the CDCA "shall not apply" to entities "licensed by the Secretary of Banking . . . under the provisions of any other statute." 7 P.S. § 6217.

This contention is inapposite. Again, the CDCA bars *OneMain* from making a sale of the Account to *any* entity without a CDCA license. Assuming *arguendo* that the CDCA does not apply to Midland,[24] and that Midland is exempt from the CDCA under § 6217,[25] neither assumption alters the outcome reached by the district court in construing Pennsylvania law.

---

[23] Section references in this part are to the CDCA.

[24] While irrelevant, the CDCA applied to Midland. First, Midland is directly subject to the CDCA because it "negotiate[d]" a loan by trying to buy the Account. 7 P.S. § 6203.B. As the Department of Banking explained, "negotiate" encompassed the act of *transferring* loans when the CDCA was enacted and encompasses that meaning today. *See* JA236–37. Second, the CDCA applied because a CDCA licensee attempted to sell Midland a loan contract. *See* 7 P.S. § 6214.I.

[25] Although irrelevant, § 6217 does not exempt Midland from the CDCA. The CDCA imposes specific requirements on licensees, *see, e.g.*, 7 P.S. §§ 6205 (license bond), 6207 (minimum capitalization), 6216.1 (advertising restrictions), and 6218 (penalties). Midland does not explain why other-licensed entities would be exempted from these requirements. Midland also fails to provide a harmonious construction of the text of the CDCA, as the CDCA repeatedly highlights the obligation of holding a license "under this act." *See* 7 P.S. §§ 6202, 6203.A, 6203.C, 6206, 6207, 6209, 6210, 6211, 6212, 6213, 6214.I, 6218; *see also* 1 Pa.C.S. § 1933 (courts must construe conflicting general and specific provisions of a statute "so that effect may be given to both"). Midland has not, and cannot, explain why the General Assembly would have made myriad references to licensing "under the act"—and granted substantial powers and imposed specific requirements on only those licensees—if it intended to fully exempt any other state-licensed party from regulation under it.

Notwithstanding Midland's error, this issue is irrelevant because OneMain could not sell the Account to Midland under § 6214.I. Further, the appellant in a related case

**C.     OneMain's Attempted Sale to Midland Is Void *Ab Initio* Under Pennsylvania Law.**

The district court correctly held that OneMain's attempted sale of the Account was void as a matter of law. Midland's argument that "neither [the LIPL nor CDCA] allows courts to void loans created in violation of the statutes' terms," Appellant Br. 22, misses the mark. In opposing Midland's motions to compel, Zirpoli never claimed the Note was void; rather, Zirpoli contends that the *sale of his Account* was void. JA209, 419, 425. The attempted sale of that Account (and any other CDCA loan) was void *ab initio* under Pennsylvania law, and the lower court properly applied Pennsylvania law in reaching that conclusion.

For over seven decades, the Pennsylvania Supreme Court has consistently applied "the general rule that an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void." *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495 (Pa. 1991) (quoting *Dippel v. Brunozzi*, 74 A.2d 112, 114–15 (Pa. 1950) (citing cases dating back to 1924 in support of this proposition)); *see also Feingold v. State Farm*

---

moved to certify the question of § 6217's effect to the Pennsylvania Supreme Court. *See* Motion to Certify Questions of State Law to the Supreme Court of Pennsylvania at 1, *Lutz v. Portfolio Recovery Assocs., LLC*, No. 21-1656 (3d Cir. June 8, 2021). This Court in *Lutz* invited the Pennsylvania Department of Banking to address, by letter brief, a similar question about § 6217, as well as the "negotiate" issue discussed in footnote 24, *supra*.

*Mut. Auto. Ins. Co.*, No. 11-CV-6309, 2012 WL 1106653, at *4 (E.D. Pa. Apr. 3, 2012), *aff'd*, 517 F. App'x 87 (3d Cir. 2013) (citing *Am. Ass'n of Meat Processors*, 588 A.2d at 496) (applying Pennsylvania law and holding that "[a] contract is void if it would run afoul of public policy"). This general rule applies to assignments. *See Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*, No. 16-CV-4850, 2021 WL 256071, at *5 n.31 (E.D. Pa. Jan. 26, 2021) (collecting state court cases); *Gordon v. Kohl's Dep't Stores, Inc.*, 172 F. Supp. 3d 840, 855 (E.D. Pa. 2016) ("[A]n assignment is permitted unless forbidden by statute [or] public policy[.]" (citing Restatement (Second) of Contracts § 317 (1981))).

When a party seeks to enforce an illegal contract, the Pennsylvania Supreme Court has stated that "[t]he law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them." *Dippel*, 74 A.2d at 114; *see also Paul v. Paul*, 109 A. 674, 675 (Pa. 1920) ("[When a party] require[s] the aid of an illegal transaction to establish his case, and, if he cannot prove his case without showing he has broken the law . . . , the court will not assist him."). In these circumstances, the Pennsylvania Supreme Court has instructed courts to dismiss proceedings to enforce such contracts *sua sponte*. *Am. Ass'n of Meat Processors*, 588 A.2d at 496.

OneMain's attempted sale of the Account is void *ab initio* under Pennsylvania law because it violates the CDCA's prohibition on unauthorized sales to entities

without CDCA licenses. The CDCA and its implementing regulations barred OneMain from selling or otherwise disposing of the Account to a party without a CDCA license, like Midland, unless the Secretary of Banking approved the transfer. 7 P.S. § 6214.I; 10 Pa. Code §§ 41.1, 41.6(a). It was undisputed that Midland lacked a CDCA license when it tried to buy the Loan, and that the Secretary of Banking did not approve the attempted sale. JA6. Without such approval, the Bill of Sale purporting to assign Zirpoli's Account—"an agreement which violates a provision of a statute"—was "illegal and void." *Am. Ass'n of Meat Processors*, 588 A.2d at 495.[26]

Midland does not contest that OneMain's attempted sale is illegal or void under *American Association of Meat Processors*. Instead, it claims "[n]either [the

---

[26] The district court correctly recognized that this conclusion squares with *Snyder v. Ngo*, No. 1389 EDA 2012, 2013 Pa. Super. Unpub. LEXIS 1183 (Pa. Super. Ct. Mar. 20, 2013), an unpublished decision from the Superior Court of Pennsylvania. *Snyder* considered whether a loan made by an entity without a CDCA license with a rate of interest permissible only for CDCA licensees was voidable rather than void. Drawing "[a] distinction . . . between a contract which is illegal in the sense that the making of the contract violates some statutory prohibition [in which case it is void], and a contract which is illegal because it calls for the performance of acts which are in themselves violations of the law [in which case it is voidable]," *id.* at *10, the court found that "the legislature did not proscribe the making of loans without a license, thereby creating an illegal purpose in any loan made without a license," but rather "proscribed the charging of excessive interest," *id.* at *12. Here, in contrast, the attempted sale of Zirpoli's contract to Midland was directly "proscribed" by the CDCA, *id.*, and was thus void *ab initio*. In any event, Zirpoli does not rely on *Snyder*, but rather on the *American Association of Meat Processors* rule, which *Snyder correctly* applied.

LIPL nor CDCA] allows a court to wholesale invalidate . . . a contract assigning the rights, title and interest in and to such loans." Appellant Br. 22. This is wrong as a matter of fact and law.

First, Zirpoli did not request that the district court "invalidate" the OneMain-Midland contract, but rather refuse to enforce it because it was made despite a legal prohibition on its formation, and was thus void *ab initio*. *See Palermo Gelato, LLC v. Pino Gelato, Inc.*, No. 2:12-CV-00931, 2013 WL 285547, at *4 n.6 (W.D. Pa. Jan. 24, 2013) (comparing void and voidable contracts under Pennsylvania law and associating *American Association of Meat Processors* with void contracts); *FDA Packaging Inc. v. Advance Pers. Staffing Inc.*, 73 Pa. D. & C. 4th 420, 430 (C.P. Berks 2005) ("[A] void contract lacks legal existence from inception, and [] the subsequent judicial declaration merely clarifies, rather than alters, the legal relationship of the parties.").

Second, a court requires no special authority from the legislature to refuse to enforce an illegal contract, *see Gen. Refractories Co. v. First State Ins. Co.*, No. 04-CV-3509, 2012 WL 568936, at *6 (E.D. Pa. Feb. 22, 2012) (characterizing a court's refusal to enforce a void contract as "a common law remedy long-recognized by the Pennsylvania Supreme Court"), but must do so as a matter of state contract law. Indeed, because OneMain's attempted sale to Midland was void *ab initio*, the district court had no other choice but to refuse to enforce it. *Cf. Mellish v. CACH, LLC*, No.

19-CV-1217, 2020 WL 1472405, at *4 (W.D. Pa. Mar. 26, 2020) ("The sale contract is therefore void and unenforceable."). A court cannot "breathe life into a void contract." *Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.*, No. 13-CV-499-RGA, 2014 WL 1389974, at *12 n.1 (D. Del. Apr. 9, 2014) (applying, *inter alia*, Pennsylvania law).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order denying Midland's motion to compel arbitration, or alternatively, vacate the district court's order because Midland was not a "party" authorized to file a petition for arbitration under 9 U.S.C. § 4. In the event this Court vacates the district court's order, it should remand with instructions that the district court exercise jurisdiction over Plaintiff's federal and state claims but entertain no further motions by Midland to compel arbitration under Plaintiff's arbitration agreement with OneMain.


Dated: November 26, 2021                    Respectfully submitted,

                                            By: /s/ Karla Gilbride
                                            _____

                                            KARLA GILBRIDE
                                            MATTHEW CLIFFORD
                                            (bar admission pending)
                                            PUBLIC JUSTICE, P.C.
                                            1620 L Street NW, Suite 630
                                            Washington, D.C. 20036
                                            (202) 797-8600

KEVIN ABRAMOWICZ
KEVIN TUCKER
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
(412) 223-5740

*Counsel for Appellee*

# COMBINED CERTIFICATIONS

I, Karla Gilbride, hereby certify as follows:

1.      Pursuant to Rule 46.1 of the Local Appellate Rules for the United States Court of Appeals for the Third Circuit, I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c), I certify that this Appellee Brief complies with the type and volume limitations of Fed. R. App. P. 32(a)(7)(B):

a. According to the word count in the word processing system employed in drafting this brief (Microsoft Word 2016), the brief contains 12,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

b. This Brief has been written in Times New Roman, a proportionally-spaced, 14-point serif font.

3.      On today's date, November 26, 2021, I filed this brief with the Clerk of the United States Court of Appeals for the Third Circuit via the Court's CM/ECF system, which will cause service on counsel for all parties of record, who are registered CM/ECF Users.

4.      I further certify that the E-Brief was scanned for computer viruses using the current version of Windows Defender, and no virus was detected.

5.      I also certify that the text of the hard copies and the E-Brief are identical.


Dated:      November 26, 2021                    /s/ Karla Gilbride